[No. 63339-8. En Banc.]
Argued May 14, 1996.     Decided June 5, 1997.
THE STATE OF WASHINGTON, *Petitioner*, v. MICHELE E. WILLIAMS, *Respondent*.

ALEXANDER and JOHNSON, JJ., dissent by separate opinion.

*James H. Krider, Prosecuting Attorney*, and *Edward E. Stemler, Deputy*, for petitioner.

*Nielsen & Acosta*, by *Kelly V. Curtin*, for respondent.

DURHAM, C.J. — Michele Williams was convicted of welfare fraud (first degree theft) for failing to advise the Department of Social and Health Services (DSHS) of an increase in household income. On appeal, she argued that the doctrine of collateral estoppel barred her prosecution since a prior civil proceeding determined she acted unintentionally. The Court of Appeals agreed and dismissed the charge against her. *State v. Williams*, 78 Wn. App. 584, 898 P.2d 340 (1995). We reverse and hold that the doctrine of collateral estoppel does not prevent prosecution of Williams. We further hold that the trial court erred in refusing to submit a proposed jury instruction on duress.

## FACTS

In June 1985, Williams and her two children moved into the home of William Wellen. At the time, she was receiving public assistance in the form of monthly cash grants, food stamps, and medical benefits. Because Wellen wanted her to continue receiving these benefits, he directed Williams to refrain from giving DSHS any information about him. As a result, Williams never reported Wellen's income or their joint bank account. She waited two years to notify DSHS of his presence in the home.

Wellen worked as a merchant seaman and returned home about every two weeks when his ship was in port. He closely controlled the household finances, carefully reviewing the joint account upon each return. Wellen required Williams to record every purchase and became furious if she failed to do so. Wellen verbally and physically abused Williams throughout their relationship, and police responded to reports of domestic violence at least twice.

Williams finally left Wellen in March 1991. That same month, Wellen reported her to DSHS. In response, the State brought an administrative action against Williams to recoup public assistance overpayments. An administrative hearing was held on November 14, 1991, to determine whether Williams received an overissuance of food stamps and financial and medical assistance. Williams represented herself at the hearing and a fair hearing coordinator represented DSHS.

Williams did not dispute receiving an overissuance of $5,411 in food stamps and the State conceded that the overissuance was due to inadvertent household error. Where food stamp overissuance is the result of inadvertent household error, DSHS deducts 10 percent from the recipient's monthly allowance to recoup its losses. By contrast, an intentionally sought overissuance results in a 20 percent deduction. WAC 388-49-640(14). In the findings of fact, the administrative law judge (ALJ) stated:

> [Williams] has established by testimony and supporting documentary evidence that during the period of the overissuance claim, she and her children were subject to severe abuse from Mr. Wellen. As a result of this abuse, [she] was unable to manage her financial affairs, and did not disclose her income and resources to DSHS as she ordinarily would to maintain her eligibility.

Clerk's Papers at 42. The ALJ concluded "the evidence shows . . . that the overissuance was an inadvertent household error," and thus ordered repayment at the 10 percent level. Clerk's Papers at 42.

The ALJ next addressed the contention of DSHS that Williams improperly received $12,634.86 in financial assistance and $7,459.52 in medical assistance. Williams did not dispute this allegation, and a central question became whether Williams acted intentionally in receiving the overpayment. If she acted intentionally, DSHS would deduct 10 percent from her monthly benefits to recoup its losses; otherwise, it would deduct only five percent. Former WAC 388-44-145(3). The ALJ found Williams "was subject to severe abuse from Mr. Wellen during the period for which overpayment is alleged" and concluded that "[n]one of the overpayments alleged are intentional overpayments because they were not the result of willful or knowing intent on the part of [Williams]." Clerk's Papers at 47, 49. Thus, Williams was subject to only a five percent grant deduction.

Just over a year later, on January 24, 1992, the Snohomish County prosecutor charged Williams with welfare fraud (first degree theft), alleging she obtained more than $1,500 in public assistance by means of *willfully* false statements or *willfully* concealing information. In a motion to dismiss, Williams argued the doctrine of collateral estoppel barred her prosecution since the administrative hearing had determined her actions not willful. The trial court denied the motion, holding that public policy did not allow the administrative hearing to bar the criminal action. Report of Proceedings at 1 (Apr. 1, 1993).

At trial it was undisputed that Williams received excess benefits. The only disputed issue was whether Williams acted willfully. Williams' sole defense was that she acted under duress. Williams testified that she believed she and her children would suffer severe abuse, or even death, if she disobeyed Wellen. A defense expert testified that Williams suffered from battered women's syndrome and that her failure to report Wellen's income was not volitional. She also testified that a batterer need not be present to exert control over his victim.

To convict Williams of theft under the court's instructions, the jury had to find that she willfully made false statements or willfully failed to reveal material facts. The defense proposed a jury instruction on duress. The court declined to give the instruction, declaring the threats to Williams not sufficiently immediate. The jury found Williams guilty of first degree theft and the trial court sentenced her within the standard range.

On appeal, Williams argued that the doctrine of collateral estoppel barred the State's prosecution. She also claimed the trial court erred in failing to give an instruction on duress. The Court of Appeals reversed the trial court and dismissed the charge against Williams, holding the doctrine of collateral estoppel barred the State's prosecution since a prior civil proceeding had determined Williams' actions not willful. Given this outcome, it did not have to address Williams' duress argument. We granted the State's petition for review.

## COLLATERAL ESTOPPEL

The doctrine of collateral estoppel is embodied in the Fifth Amendment guaranty against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 1195, 25 L. Ed. 2d 469 (1970).

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate

fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Ashe*, 90 S. Ct. at 1194. Under this doctrine, a civil proceeding may bar a criminal action if it resolved similar issues. *Yates v. United States*, 354 U.S. 298, 77 S. Ct. 1064, 1085, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 2151, 57 L. Ed. 2d 1 (1978).

■■ The party asserting collateral estoppel bears the burden of proof, *McDaniels v. Carlson*, 108 Wn.2d 299, 303, 738 P.2d 254 (1987), and four requirements must be met:

(1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (4) application of the doctrine must not work an injustice.

*State v. Cleveland*, 58 Wn. App. 634, 639, 794 P.2d 546 (1990) (quoting *Beagles v. Seattle-First Nat'l Bank*, 25 Wn. App. 925, 929, 610 P.2d 962 (1980)); *accord Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983). Our courts have yet to apply the doctrine of collateral estoppel to bar a criminal prosecution.

In *State v. Dupard*, 93 Wn.2d 268, 609 P.2d 961 (1980), we held that the State was not collaterally estopped from prosecuting a defendant even after a parole board declared him "not guilty." Dupard was arrested for possession of controlled substances while on parole. At his parole revocation hearing, the board ruled he was "not guilty" of a parole violation, and at least one board member questioned whether there "was good enough evidence" against Dupard. *Dupard*, 93 Wn.2d at 270.

Following the parole board hearing, Dupard was prosecuted. In pretrial motions, Dupard argued the State was

collaterally estopped from prosecuting him because of the "not guilty" finding at the parole revocation hearing. *Dupard*, 93 Wn.2d at 270-71. The State claimed the identity of the parties differed at the two proceedings: an assistant attorney general represented the State at the parole board hearing while a prosecutor represented the State at the criminal trial. *Dupard* flatly rejected finding a distinction between the assistant attorney general and the prosecutor since both represented the State. *Dupard*, 93 Wn.2d at 273.

Nonetheless, *Dupard* refused to bar the State's prosecution, citing public policy, specifically the different roles a parole board hearing and a criminal trial play. While a parole board hearing is to determine if a parole violation occurred, the "question to be answered [in a criminal prosecution] is whether the parolee in fact committed a new crime." *Dupard*, 93 Wn.2d at 276. We concluded that "this inquiry is more appropriately addressed to the criminal justice system." *Dupard*, 93 Wn.2d at 276.

Following *Dupard*, the Court of Appeals addressed whether the doctrine of collateral estoppel barred criminal prosecution for child sexual abuse where the State previously failed to prove the alleged abuse at a dependency hearing. *State v. Cleveland*, 58 Wn. App. 634, 794 P.2d 546, *review denied*, 115 Wn.2d 1029 (1990), *and cert. denied*, 499 U.S. 948 (1991). The court acknowledged that the allegations dismissed at the dependency hearing were *identical* to the criminal charges against Cleveland. *Cleveland*, 58 Wn. App. at 639. Nonetheless, the court held the doctrine collateral estoppel did not bar prosecution of Cleveland, citing *Dupard* for the proposition that "collateral estoppel can be qualified or rejected when its application would contravene public policy." *Cleveland*, 58 Wn. App. at 640.

[W]e find overall considerations of public policy are determinative of the question before us. Dependency proceedings are often attended with a sense of urgency, are held as promptly as reasonably possible, and the entire focus of the proceeding

is the welfare of the child. The focus being more narrow than in a typical felony trial, the State normally does not need, nor does it perform, the extensive preparation typically required for felony trials.

*Cleveland,* 58 Wn. App. at 643-44.

The State in the present case sets forth three basic arguments. First, it argues that the administrative hearing and criminal trial presented different issues. At trial, the State had to prove that Williams acted *willfully* in obtaining excess public assistance. RCW 74.08.331. However, at the administrative hearing the State had to prove only that Williams acted *knowingly.* Former WAC 388-44-020.[1] Nonetheless, both the administrative hearing and the criminal trial focused on the issue of Williams' mens rea in obtaining excess benefits. Although the State's burden of proof differed, the legal issue remained the same.

Second, the State argues that the context of the administrative hearing differed from that of the criminal trial.

The context of the administrative hearing was to determine how much of defendant's current benefits should be withheld to repay the overpayment. In the criminal trial the issue of intent when [sic] to whether she should be held accountable for her actions. Since the contexts were entirely different, the issues were not identical and collateral estoppel does not apply.

Br. of Resp't at 10. The Court of Appeals correctly rejected this argument after determining that "both proceedings required resolution of whether Williams [acted] intentionally." *State v. Williams,* 78 Wn. App. 584, 589-90, 898 P.2d 340 (1995).

Third, the State claims that the Snohomish County Prosecutor's Office and DSHS were not in privity. Nonetheless, the State concedes that we rejected this argument in *Dupard. Dupard,* 93 Wn.2d at 273; *see also Cleveland,*

---

[1]Former WAC 388-44-020(1) defines "intentional overpayment" of welfare benefits as "occurring when there is willful *or* knowing intent of the recipient to either receive or retain an overpayment." (Emphasis added.)

58 Wn. App. at 639-40. Since the prosecutor's office and DSHS both represent the State, they are in privity.

Neither the State nor Williams discuss the fourth prong of collateral estoppel which prevents application of the doctrine from working an injustice. Nonetheless, this element recognizes the significant role of public policy. Both *Dupard* and *Cleveland* were decided on public policy grounds. In fact, *Cleveland* refused to apply the doctrine even though the issues at the administrative hearing were exactly identical to those in the criminal action. As in *Cleveland*, we are faced with a similar situation since both the administrative hearing and the criminal proceeding required a determination of whether Williams acted willfully in obtaining excess welfare benefits.

We note at the onset that we are not faced with the question of whether the State *should* prosecute Williams, notwithstanding the ALJ's determination that her actions resulted from years of severe abuse. Rather, we must determine whether the State *could* prosecute her.

While some foreign jurisdictions have barred prosecution under the doctrine of collateral estoppel,[2] both *Dupard* and *Cleveland* require us to closely examine public policy. We conclude that public policy simply does not allow a DSHS administrative hearing to prevent the State from prosecuting Williams.

First, the purposes underlying the administrative hearing and the criminal trial in the present case are wholly distinct. The purpose of the hearing was to determine whether Williams received overpayments of public assistance and the rate at which she would repay DSHS. The purpose of the criminal prosecution was to determine whether Williams had committed a crime. It is already established that the latter inquiry "is more appropriately addressed to the criminal justice system." *Dupard*, 93 Wn.2d at 276.

---

[2]*People v. Sims*, 32 Cal. 3d 468, 651 P.2d 321, 186 Cal. Rptr. 77 (1982); *People v. Watt*, 115 Mich. App. 172, 320 N.W.2d 333, 30 A.L.R.4th 848 (1982).

Second, allowing this administrative proceeding to bar a criminal action would have broad consequences. It would result in longer administrative hearings and greater delays since the State would "be required to marshall all of the prosecution's potential witnesses and evidence at the administrative level." *People v. Sims*, 32 Cal. 3d 468, 651 P.2d 321, 337, 186 Cal. Rptr. 77 (1982) (Kaus, J., dissenting). This would leave "district attorney offices to allocate a greater proportion of their ever-decreasing resources to administrative matters, rather than reserving these scarce resources for the actual prosecution of serious criminal cases in court." *Sims*, 651 P.2d at 337 (Kaus, J., dissenting). As a result, the State most likely would consider foregoing administrative hearings even though such hearings allow it to recoup financial losses resulting from fraud. Public policy militates against this. We therefore reverse the Court of Appeals and hold that the doctrine of collateral estoppel does not bar the State from prosecuting Williams.

## DURESS

■ Williams admitted to receiving public assistance overpayments. Her sole defense at trial was that her actions were the result of duress. The defense of duress, codified at RCW 9A.16.060(1), provides:

In any prosecution for a crime, it is a defense that:

(a) The actor participated in the crime under compulsion by another who by threat or use of force created an apprehension in the mind of the actor that in case of refusal he or another would be liable to immediate death or immediate grievous bodily injury; and

(b) That such apprehension was reasonable upon the part of the actor; and

(c) That the actor would not have participated in the crime except for the duress involved.

The trial court was satisfied there was sufficient evidence

that Williams suffered from battered women's syndrome and that she had a reasonable apprehension of harm from Wellen. Nonetheless, the trial court refused to submit the proposed instruction, finding that the harm was not immediate.[3] This was error.

The trial court reasoned that it would not be possible for Wellen, who was often away at sea, to inflict "immediate" harm. However, the duress statute does not require that it actually be possible for the harm to be immediate. Rather, it directs the inquiry at the defendant's *belief* and whether such belief is reasonable. Granted, in many if not most cases, the reasonableness of such belief would be foreclosed by the impossibility of the harm being immediate. Therefore, it may be appropriate in other circumstances for the trial court to refuse to give a duress instruction when the evidence establishes the impossibility of immediate harm.

However, in the battered person context, we have allowed expert testimony to show how severe, ongoing abuse can affect the defendant's perceptions and reactions in ways that may not be apparent to the average juror. *See State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994). Such evidence is introduced to explain not only the defendant's subjective mental state, but also the reasonableness of the defendant's actions. *Id.* Thus, the reasonableness of the defendant's perception of immediacy should be evaluated in light of the defendant's experience of abuse. *See State v. Janes*, 121 Wn.2d 220, 239, 850 P.2d 495 (1993). This is a question of fact, which generally should be resolved by a jury. *State v. Turner*, 42 Wn. App. 242, 245, 711 P.2d 353 (1985), *review denied*, 105 Wn.2d 1009 (1986). Each side is entitled to have the jury instructed on its theory of the case if there is evidence to support that theory.

---

[3]The proposed jury instruction would have required the State to disprove duress beyond a reasonable doubt. As the State points out, this inaccurately sets forth the law. "The State, in carrying the burden of proving each element of an offense, does not bear the burden of disproving a claim of duress." *State v. Riker*, 123 Wn.2d 351, 366 n.6, 869 P.2d 43 (1994).

*State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). Failure to so instruct is reversible error. *State v. Griffin*, 100 Wn.2d 417, 420, 670 P.2d 265 (1983). We hold that Williams introduced sufficient evidence to entitle her to a duress instruction

We therefore reverse the Court of Appeals and remand for retrial.[4]

DOLLIVER, SMITH, GUY, MADSEN, TALMADGE, and SANDERS, JJ., concur.

ALEXANDER, J. (dissenting) — I agree with the conclusion the majority reaches to the effect that Michele E. Williams presented sufficient evidence of duress to send that issue to the jury. The trial court's failure to give a duress instruction, therefore, was reversible error. Nevertheless, it is my view that we need not order a new trial to cure the instructional error. I reach that conclusion because I am satisfied that the Court of Appeals correctly concluded that the State's prosecution of Williams for first degree theft (welfare fraud) is barred by collateral estoppel. Consequently, the charge against Williams should be dismissed. Because the majority has concluded otherwise, I dissent.

As the majority notes, the doctrine of collateral estoppel is embodied in the Fifth Amendment guaranty against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970). Under that doctrine a criminal prosecution may be barred when a prior proceeding has resolved similar issues. *Yates v. United States*, 354 U.S. 298, 335, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

Unfortunately, no prior Washington case has addressed the precise question we have here: does collateral estoppel

---

[4]Williams also argues that the trial court erred in excluding her testimony that she is repaying DSHS. On retrial, the trial court should once again balance the probative value of the proffered testimony against its prejudicial effect.

bar the prosecution of a person for welfare fraud, if the prosecution follows a civil proceeding in which it was determined that the person did not willfully obtain public assistance to which he or she was not entitled?

Courts in other states have, however, addressed this issue. For example, in *People v. Watt*, 115 Mich. App. 172, 320 N.W.2d 333, 30 A.L.R.4th 848 (1982), the Michigan Court of Appeals faced similar facts and reached a result consistent with that reached by the Court of Appeals here. In *Watt*, the defendant was found guilty of two counts of welfare fraud, the jury apparently concluding that a statement the defendant welfare recipient made to the Michigan Department of Social Services (DSS), to the effect that she was not living with her ex-husband at the time she obtained the questioned welfare benefits, was false.

Significantly, Watt's criminal convictions followed an administrative proceeding in which the Michigan DSS attempted to terminate Watt's eligibility for Aid to Families With Dependent Children benefits, claiming that Watt obtained benefits she was not entitled to receive due to her failure to report the income of her ex-husband. An administrative law judge ruled against the State, determining that the DSS had not met its burden of showing that Watt lived with her ex-husband during the time she received the alleged overpayments. *Watt*, 320 N.W.2d at 334.

Given that prior determination, the Michigan Court of Appeals reversed Watt's convictions and ordered dismissal of the charges. In doing so, it noted that "[f]or purposes of application of collateral estoppel, [the prosecutor and DSS] are both creatures of the same sovereign, namely, the State of Michigan." *Watt*, 320 N.W.2d at 336. Moreover, it held that the issue determined by the administrative law judge — whether Watt lived with her ex-husband — was substantially the same as the central issue of the criminal trial. Finally, it concluded that because the State could not meet the lower burden of proof at the administrative hearing, it was not unjust to apply collateral estoppel as a bar to the criminal prosecution. *Watt*, 320 N.W.2d at 334.

Similarly, in *People v. Sims*, 32 Cal. 3d 468, 651 P.2d 321, 186 Cal. Rptr. 77 (1982), the Supreme Court of California held that the State of California was collaterally estopped from prosecuting a defendant who had been found, in an administrative action maintained by the State to recoup alleged overpayments, to have not fraudulently obtained welfare benefits. In doing so, the *Sims* court listed three public policy reasons for applying the doctrine of collateral estoppel as a bar to criminal prosecution. First, it indicated that application of the doctrine would advance "judicial economy by minimizing repetitive litigation." Second, it observed that it would preclude the possibility of inconsistent judgments which may "undermine the integrity of the judicial system[.]" *Sims*, 32 Cal. 3d at 488. Finally, the court stated that it would prevent the "harassment" of successive litigation, indicating that "[t]o subject [Sims] to a second proceeding in which she must defend herself against the very same charges of misconduct would be manifestly unfair." *Sims*, 32 Cal. 3d at 489.

In Washington, a party asserting the bar of collateral estoppel bears the burden of showing four requirements:

> (1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (4) application of the doctrine must not work an injustice.

*State v. Cleveland*, 58 Wn. App. 634, 639, 794 P.2d 546 (quoting *Beagles v. Seattle-First Nat'l Bank*, 25 Wn. App. 925, 929, 610 P.2d 962 (1980)), *review denied*, 115 Wn.2d 1029 (1990), *cert. denied*, 499 U.S. 948 (1991). Because the majority acknowledges that requirements one through three have been shown, I have devoted my attention to requirement four. This requirement, as the majority notes, recognizes the role of public policy. Indeed, in reversing Williams's conviction, the Court of Appeals addressed public policy considerations, saying:

[I]t is our perception that public policy would be better served if the State were estopped from prosecuting a welfare fraud charge where the recipient has previously been adjudged not to have intentionally received public assistance overpayments. Specifically, by preventing relitigation of an issue already litigated, judicial economy, the policy upon which the doctrine of collateral estoppel is based, would be served. In addition, the integrity of [the] judicial system would be fostered by avoiding the possibility of inconsistent judgments. Finally, concerns of fairness and of protecting welfare recipients, who by definition can ill-afford the costs of repeated litigation, would be served by applying collateral estoppel.

*State v. Williams*, 78 Wn. App. 584, 593, 898 P.2d 340 (1995), *review granted*, 128 Wn.2d 1007 (1996).

In reversing the Court of Appeals, the majority relies heavily on our decision in *State v. Dupard*, 93 Wn.2d 268, 609 P.2d 961 (1980). In that case, we held that the State was not collaterally estopped from prosecuting a defendant for possession of cocaine and heroin even though the parole board had determined, at a prior parole revocation hearing, that the defendant had possessed heroin, but not cocaine. *Dupard*, 93 Wn.2d at 277. In concluding that public policy would not be served by barring a subsequent criminal prosecution of Dupard, we indicated that because a "[p]arole revocation is not part of a new criminal prosecution," but "is a 'continuing consequence' of the *original* conviction," the subsequent criminal charges may be maintained. *Dupard*, 93 Wn.2d at 276.

There are two reasons why I believe the majority's reliance on *Dupard* is misplaced. First, in *Dupard,* we made it clear that our ruling was limited to the unique circumstances of a parole revocation hearing, stating that, "[w]e granted review limited to a single issue: In a criminal case, is the State collaterally estopped from relitigating an issue previously decided in favor of the defendant at a *parole revocation hearing*?" *Dupard*, 93 Wn.2d at 271 (emphasis added). Second, and more importantly, the public policy we relied on in *Dupard* is inapplicable here.

That is so because the administrative proceeding to recoup welfare benefits that Williams allegedly obtained by fraud was not a "continuing consequence" of a prior criminal conviction.

The majority sets forth what it suggests is an additional public policy reason disfavoring application of collateral estoppel. It contends that the purposes of the administrative hearing and the criminal trial are "wholly distinct," noting that the purpose of the administrative hearing was to determine whether Williams obtained overpayments of public assistance and the rate at which she would repay the Department of Social and Health Services (DSHS), whereas the criminal trial was devoted to determining if a crime had been committed. Majority op. at 257. While the majority correctly observes that the consequences of the two proceedings differed, the fundamental issue that was to be determined in each proceeding was identical. Indeed, the majority recognized this, indicating that "both the administrative hearing and the criminal trial focused on the issue of Williams' mens rea in obtaining excess benefits." Majority op. at 256.[5]

The majority also places reliance on a decision of the Court of Appeals in *State v. Cleveland*, 58 Wn. App. 634, a case in which that court, citing *Dupard*, addressed the question of whether the doctrine of collateral estoppel barred a criminal prosecution for statutory rape and indecent liberties which followed a dependency hearing at which the State failed to prove the alleged sexual abuse. In concluding that the doctrine was not applicable, the *Cleveland* court set forth a public policy rationale for its decision, saying:

we find overall considerations of public policy are determina-

---

[5]The prosecutor in Williams's criminal case acknowledged the similarity between the issues in the administrative hearing and the criminal trial, saying "they [administrative hearing] were looking at whether that was an intentional overpayment and that definition is occurring when there is willful or knowing intent. Although they're not exactly the same, I would probably have to concede they are pretty close to what we're dealing with here in the criminal trial." Verbatim Report of Proceedings at 6 (Apr. 1, 1993).

tive of the question before us. Dependency proceedings are often attended with a sense of urgency, . . . the entire focus of the proceeding is the welfare of the child. The focus being more narrow than in a typical felony trial, the State normally does not need . . . the extensive preparation typically required for felony trials.

*Cleveland*, 58 Wn. App. at 643-44.

*Cleveland*, in my judgment, does not support the majority's opinion. That is so because an administrative proceeding to recoup allegedly ill-gotten welfare benefits is significantly different than a dependency hearing. In the former proceeding, there is generally no sense of urgency, whereas in the dependency proceeding, the over-riding concern for the dependent child's welfare frequently requires immediate action to ensure the safety and well-being of that child. Furthermore, the focus of an administrative proceeding to recover excess benefits obtained by an intentional violation of the public assistance laws is not narrower than the criminal proceeding, both proceedings focusing on the recipient's intent in accepting the excess benefits.

Additionally, nothing in the record supports a conclusion, similar to that which we made in *Dupard*, to the effect that the State does not have adequate time to prepare and present its case at an administrative proceeding. Neither is there any support for a conclusion that the State prepares less for an administrative proceeding to recover intentionally received overpayment of welfare benefits than it does for a felony trial. Not surprisingly, the record contains little information about the degree to which the State prepared for the administrative proceeding or the criminal trial that led to this appeal. It does, however, reflect that Williams's criminal defense attorney told the trial court that Williams testified at the administrative proceeding, and that "[p]ersons from [DSHS] came in with financial records, testified, presented documentary proof to establish that monies had in fact been received." Verbatim Report of Proceedings at 2 (Apr. 1, 1993).

In sum, the public policy rationale offered by the majority does not persuade me that it would be unjust to give collateral estoppel effect to the administrative determination. The proper focus of a public policy analysis should be on whether the prior adjudication offered a full and fair hearing, not whether it contained all the trappings of a felony trial in superior court. *See Robinson v. Hamed*, 62 Wn. App. 92, 100, 813 P.2d 171, *review denied*, 118 Wn.2d 1002 (1991). Although we have not been furnished with a complete record of the administrative proceeding, it is undisputed that the State was represented by a so-called "Fair Hearing Coordinator" from DSHS, and that the hearing was presided over by an administrative law judge. Clerk's Papers at 54. While it is unlikely that the administrative proceeding had all of the formalities that attend a trial in superior court, we should not assume that it was not a full and fair hearing and that the administrative law judge did not fairly consider testimony of Williams and other evidence.

The majority also expresses a concern that if the doctrine of collateral estoppel is applied to bar a subsequent criminal prosecution in cases such as this, the State may simply forgo taking steps to recover intentionally obtained overpayments of welfare benefits in administrative proceedings. This, it suggests, would be poor public policy. Majority op. at 258. Even if that concern is justified, the State's forbearance from seeking recoupment via an administrative proceeding is not problematic in cases where criminal charges are laid. That is so because the prosecuting attorney is under a duty to recommend to the court that restitution be imposed in appropriate cases as part of a defendant's sentence. RCW 9A.20.030.[6]

In the final analysis, the principles that the California and Michigan courts recognized in *Sims* and *Watt* are applicable here. While those cases do not compel affirmance of the Court of Appeals, they strike me as sensible

---

[6]The court can also order a defendant to pay a legal financial obligation as part of the defendant's sentence under RCW 9.94A.145.

determinations. The plain fact is that, like the situation in *Sims* and *Watt*, both proceedings against Williams were maintained by the State and resolved identical issues. In such cases, application of the doctrine of collateral estoppel promotes justice by making certain that two actions which determine the same issue are not maintained against the same person. Such a result fosters judicial economy and mitigates against the unfairness of successive litigation.

JOHNSON, J., concurs with ALEXANDER, J.

Reconsideration denied July 15, 1997.