# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83871-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WILLIAM RILEY RAINS, II, | |
| Appellant. | |

BIRK, J. — William Rains, II, appeals his conviction of misdemeanor harassment. He argues (1) the trial court violated his due process right by failing to give a no duty to retreat jury instruction, (2) the State engaged in prosecutorial misconduct by misstating the law of self-defense, (3) the State engaged in prosecutorial misconduct by introducing evidence in violation of a pretrial ruling, (4) there was cumulative error, (5) the State presented insufficient evidence to convict under the First Amendment, and (6) the trial court erred in ordering the victim penalty assessment and DNA[1] fee. We affirm William's[2] conviction and remand for the trial court to strike the victim penalty assessment and the DNA fee.

I

The State alleged that on October 15, 2020, William threatened to kill his wife, Brittany Rains, from whom he was separated. The State charged William with

---

[1] Deoxyribonucleic acid.
[2] For clarity, we use first names to refer to William Rains and witness Brittany Rains, his former spouse. We do not intend disrespect.

felony harassment – domestic violence. At trial, Brittany and William provided different versions of what had occurred.

Brittany testified William arrived at her father's house between 12:00 a.m. and 1:30 a.m. Brittany testified she had not invited him over and had texted him " '[p]lease do not come to my dad's house. You are not welcome here.' " When she walked onto the porch, Brittany saw William park next to her vehicle and "start[] do[ing] something to the side of [her] car." Brittany told William to " '[g]et away from [her] car' " and to " 'get out of here.' " Once William returned to his vehicle, Brittany walked to hers and noticed a scratch down the side of her car that had not been there before. Brittany said she approached the driver's side of William's car and placed her hands on his window sill, begging and pleading for him to hear her out. Brittany testified that during the argument William became upset and grabbed onto her hands, putting "his fingernails into my skin, and he's . . . in my face saying these same sorts of threats" as he had made in text messages before he had arrived at the property. While attempting to get out of his grip, Brittany claimed she slid through the window and got into the car with him. Brittany testified "he puts his hands on my throat and he says—I can't remember [if] he said 'I'm going to kill you' or 'You're going to be killed,' " together with reference to action William would take after she was in the grave. Brittany jumped out of the window and ran into the house to call the police while William drove away.

William testified Brittany invited him over that night. When he arrived at the house, he knocked on the front door and heard Brittany yell from the front of the house " 'Nope, it's too late. You need to go home. You're not welcome here.' "

William testified that on the walk back to his vehicle, he attempted to open Brittany's car door to leave a present for her, but the vehicle was locked. Brittany ran outside and told William to get away from her car. As William got back into his vehicle, he testified Brittany ran up to the car and grabbed the window asking him to talk. William testified that during the conversation, Brittany became upset about the way William was dressed. Brittany attempted to rip William's earring out of his ear, before lunging at him and clawing at his face. Brittany grabbed William by the throat, choking him to the point where he could not breathe. William testified he squeezed Brittany's hands to get them off him and drove away.

The trial court granted William's motion to instruct the jury on the lesser included offense of misdemeanor harassment and agreed to deliver self-defense instructions for both charges. However, the trial court refused to give a no duty to retreat instruction based on lack of evidence that William had a right to be present, as opposed to only permission.

The jury acquitted William of the felony harassment charge, but found him guilty of misdemeanor harassment. During sentencing, the trial court imposed "the mandatory $500 victim impact fee and $100 DNA collection fee." William appeals his conviction and sentence.

II

William argues the trial court provided incomplete jury instructions by refusing to instruct on no duty to retreat. William argues that without the no duty to retreat instruction, the State was not held to its burden to disprove self-defense. We conclude that any error was harmless.

3

Because the trial court's refusal to provide an instruction was based on a legal conclusion, our review is de novo. See State v. Scherf, 192 Wn.2d 350, 400, 429 P.3d 776 (2018). Generally, a criminal defendant is entitled to an instruction on their theory of the case if there was evidence to support that theory. State v. Williams, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997). In considering whether evidence is sufficient to support a jury instruction, we view the evidence in the light most favorable to the party that requested the instruction. State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). "The law is well settled that there is no duty to retreat when a person is assaulted in a place where [they have] a right to be." State v. Redmond, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003). It is reversible error to decline a no duty to retreat instruction where "a jury may objectively conclude that flight is a reasonably effective alternative to the use of force in self-defense." Id. at 495.

The parties' arguments in the trial court focused on whether William had the "right" to be on the property, where he based that assertion on having Brittany's permission to be there. A possessor of property may explicitly or impliedly consent to a licensee's entry. See Singleton v. Jackson, 85 Wn. App. 835, 839, 935 P.2d 644 (1997). Consent may be implied through conduct or by application of local custom. Id. For instance, one implied license recognized by common law is a homeowner's implied license to third parties to approach a front door and knock in an attempt to make contact for a customary purpose. State v. C.B., 195 Wn. App. 528, 538-39, 380 P.3d 626 (2016) (citing Florida v. Jardines, 569 U.S. 1, 8, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013)). "This implicit license typically permits the

visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Jardines, 569 U.S. at 8.

In Harvey, the defendant shot and killed two men in the parking lot of an apartment building. In re Personal Restraint of Harvey, 3 Wn. App. 2d 204, 206-07, 415 P.3d 253 (2018). Neither Harvey nor the victims lived in the building or had an ownership interest in the property. Id. at 216. Analyzing whether Harvey had a right to be in the private parking lot, the court explained that conduct that would otherwise constitute a trespass will not be considered so if it is privileged. Id. Privilege can derive from "consent of the possessor or may be given by law because of the purpose for which the actor acts." Id. Because there was no evidence of express or implied consent to Harvey's entering the parking lot, the court held it was not erroneous to refuse the no duty to retreat instruction. Id. at 218.

Viewing the evidence in the light most favorable to William, there is some evidence William had consent from Brittany to be on the property at the time of the charged threat. William testified that before the incident he had permission to be on Brittany's property based on her express invitation to come over that night. William testified Brittany initially revoked that permission by demanding William leave the residence, but then she ran after him, placed her hands on his window sill, and pleaded for him to hear her out. Both William and Brittany testified that Brittany asked him to hear what she had to say, and the State argued the same thing in its closing argument. There was evidence William had express or implied

5

consent to be on the property at the time of the incident, and therefore had a right to be present for purposes of a no duty to retreat instruction.

However, failing to give a no duty to retreat instruction may be considered harmless error. Our standard of review depends on whether the trial court's error was constitutional or nonconstitutional. A constitutional error is harmless if we are "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result, despite the error." State v. Aumick, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995). Where the error is not of constitutional magnitude, we apply the rule that "error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). We have previously held the absence of a no duty to retreat instruction does not give rise to a manifest error affecting a constitutional right. See State v. Lucero, 152 Wn. App. 287, 292, 217 P.3d 369 (2009) (error cannot be assigned for the first time on appeal for not giving an unrequested no duty to retreat instruction), rev'd on other grounds, 168 Wn.2d 785, 230 P.3d 165 (2010).

According to William, the absence of a no duty to retreat instruction presents an error of constitutional magnitude. We disagree. The trial court instructed on self-defense. This instruction informed the jury it is lawful to use force when a person "reasonably believes that he or she is about to be injured" and when "the force is not more than is necessary." The State was required to prove that William did not "employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into

6

consideration all of the facts and circumstances known to the person at the time of and prior to the incident." For purposes of due process, the State was held to its burden. State v. Chacon explains, "To satisfy due process under the Fourteenth Amendment, the prosecution bears the burden of proving every element of every crime beyond a reasonable doubt." 192 Wn.2d 545, 549, 431 P.3d 477 (2018). But Chacon rejected a claim that the constitution required definitional language further reinforcing the reasonable doubt standard and presumption of innocence so long as the instructions "adequately relayed the State's burden of proof beyond a reasonable doubt and the defendant's presumption of innocence." Id. at 549, 553. Here, the State proved that William did not use lawful force. Any error in the failure to give a further instruction refining the definition of lawful force is not a constitutional one.

We therefore ask whether, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. The lack of a no duty to retreat instruction was harmless under this standard. William did not rely on self-defense as his theory of the case. In his opening statement, William argued he did not threaten Brittany. While testifying, William denied ever threatening to kill Brittany. Consistent with this, he did not argue that he made a threat in self-defense. In closing, William emphasized the jury was instructed on self-defense because

> if [William] is being choked by somebody, okay, and he grabs them and takes their hands off, that is conduct; right? And so he is allow[ed] to defend himself when [he] is being assaulted, and you can't use that

7

conduct against him when judging whether or not he's guilty of felony harassment. *That's why it's in there.*

(Emphasis added.) This closing argument asked the jury not to use defensive actions as evidence that William made the charged threat, but did not argue that making the threat was in self-defense. Additionally, the jury's verdict indicated the jurors believed Brittany's testimony that William verbally threatened her. There is no reasonable probability the jury would have reached a different verdict had the trial court given a no duty to retreat instruction. Therefore, any error in refusing to give a no duty to retreat instruction was harmless.

III

William next argues he was denied a fair trial when the prosecutor misstated the law of self-defense during closing arguments and when the prosecutor introduced evidence of William's activity with the "cartel." We disagree.

Our federal and state constitutions guarantee persons accused of a crime the right to a fair trial. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 3, 22. "A defendant arguing that prosecutorial misconduct violated his or her right to a fair trial has the burden of showing the prosecutor's conduct was both improper and prejudicial in the context of the entire trial." State v. Walker, 182 Wn.2d 463, 477, 341 P.3d 976 (2015). To show prejudice requires that the defendant show a substantial likelihood that the misconduct affected the jury verdict. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). However, if a defendant is raising prosecutorial misconduct for the first time on appeal, an error is waived unless the defendant establishes "that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." Id. If

the prejudice could have been cured by a jury instruction, but the defense did not request one, reversal is not required. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994).

A

During the State's closing arguments, the prosecutor addressed the self-defense jury instruction. The prosecutor argued, "[B]y the defendant's own testimony, he said he never put his hands on her throat, he never threatened her. He said he would never threaten his wife. Self-defense, implicit in the instruction, says that he must match the force when he perceives a threat." William did not object. The prosecutor further questioned

> how can you find that he was acting in self-defense, if by his own admission, he did nothing? He said nothing, he didn't place his hands on her neck. [William] is not charged with assault. [William] is charged with felony harassment. At the heart of that harassment threat, is the threat to kill. So unless Brittany made threats to kill him and made an action in concordance with that and [William] responded with equal force to stop that injury, then there is a self-defense claim here. It does not apply. [William] did not act in self-defense here.

William again did not object.

Both statements were improper. First, it was not accurate to suggest that self-defense could be not be relied on if the jury did not believe William's denial of using any force, nor that force used in self-defense "must match" the injury threatened. Rather, as the trial court instructed the jury, a person may use "such force" as a reasonably prudent person would use under the same or similar conditions. Second, it was not accurate to say that the defense did not apply to the charged threat unless Brittany had made a threat. Again, as the trial court

9

instructed the jury, it was a defense to a charge of harassment if William "offer[ed] to use force" in self-defense.

Despite these misstatements, William fails to show that an instruction could not have cured any prejudice. Had William objected, the trial court could have properly explained the law of self-defense, and done so by referring the prosecutor and the jury to the instructions they had just been given. In addition to not objecting, William's failure to move for a curative instruction or a mistrial for an allegedly improper remark, "strongly suggests the argument did not appear [irreparably prejudicial] in the context of the trial." State v. Negrete, 72 Wn. App. 62, 67, 863 P.2d 137 (1993).

Additionally, the prosecutor's misstatements were not inflammatory and were limited to one short section of her closing argument. The jury was provided with instructions defining self-defense and accurately explaining when a person is entitled to use it. We presume that juries follow instructions. State v. Graham, 59 Wn. App. 418, 428, 798 P.2d 314 (1990). In the context of the instructions, the prosecutor's misstatements read as attempts to argue considerations that were appropriately before the jury. Self-defense requires proportionality of the force to the situation, and the State was entitled to argue that Brittany did not direct a threat toward William or a corresponding action. The prosecutor's misconduct was neither flagrant nor ill intentioned. The prosecutor's misstatements were "not the type of comments [our Supreme Court] has held to be inflammatory," State v. Brett, 126 Wn.2d 136, 180, 892 P.2d 29 (1995), so there is no possibility that the prosecutor's statements engendered an "inflammatory effect," State v. Perry, 24

10

Wn.2d 764, 770, 167 P.2d 173 (1946).  Cf. State v. Belgarde, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) (prosecutor attempted to use prejudice and stereotypes as a basis for finding defendant guilty); State v. Reed, 102 Wn.2d 140,143-44, 684 P.2d 699 (1984) (prosecutor repeatedly called the defendant a liar, stated the defense had no case, and implied the defense witnesses should not be believed because they were from out of town and drove fancy cars).  While we do not condone the prosecutor's misstatements of the law of self-defense, that the statements here read as both mistaken and an attempt to argue appropriate contentions is critical to our conclusion that this misconduct does not justify a new trial.

B

William argues he was denied a fair trial when the prosecutor introduced highly prejudicial evidence of William's activity with the "cartel."  We disagree.

1

In a pretrial motion in limine, the State moved to admit ER 404(b) evidence of William's prior threats to kill Brittany, threats via text message leading up to the incident at hand, and William's prior drug abuse.  William moved to exclude all ER 404(b) evidence, exclude or redact Brittany's 911 calls, and exclude the text messages leading up to the incident.

During discussion of the motions in limine, the trial court reserved ruling on the text messages within the 24 hours leading up to the altercation, but ruled that

text messages made on the night at issue would be admitted.  With respect to the drug abuse, the State argued,

> [William], himself, talks about being wanted in the cartel and owing money to people in the cartel for drugs.  In the text message exchange that is disclosed in discovery in this case . . . .
> . . . .
> . . . and that's one of the things that they argue about in this text message exchange, is the fact that he believes people want to kill him, part of the cartel, and that he doesn't have money.

However, the trial court found that prior drug use had not been proven by a preponderance of the evidence, and excluded it under ER 404(b).  The trial court ruled the 911 calls fell under the excited utterance exception to the hearsay rule.  However, given the trial court's prior ruling about drug use, it ruled "those comments should be excised from the tape recording."  William provided the trial court with line by line proposed redactions to the 911 call, specifically arguing "all the stuff about the cartel, killed by people, all of that would be ER 403, and we would move to exclude it."  The specific proposed redaction at issue on appeal is shown by the following strikethrough text:

> Like, I have every message from the last 24 hours from him threatening to jump off a bridge, threatening to kill himself, ~~telling me that he's going to get shot by the cartel~~, telling me that he's going to get killed by people, that he made a mistake, to telling me, like, he is going to end my life.

The trial court accepted the redaction.

At trial, Brittany testified that William made threats "[t]elling [her] that the cartel's after him."  William did not object. The State admitted and published to the jury six exhibits of text messages leading up to the incident.  When asked what threats William made to Brittany while the two were arguing in the car, Brittany

12

testified, "[I]t's really hard to remember exactly what he said, but the same things as the text messages, and saying, like 'I have the cartel after me.' " Again, William did not object. Brittany further stated she "felt fear, especially with the messages leading up to that, saying with his involvement of [the] cartel following him, and that he's going to be dismembered." William then objected based on ER 404(b), arguing "all of this" was excluded, and was overruled.

Outside the presence of the jury, William argued he thought "the Court ruled all drugs were excluded, the stuff about the cartel was excluded, and it was [his] understanding the State wasn't going to be offering anything about the cartel." The trial court clarified it "did not rule that the threats leading up to this event was— unsure where it occurred in time, but that there were threats that had led up to this event that were open—that were fair game." The trial court further stated, "The mention of the cartel, that was taken out [of] the transcript of the 911 call. That was a 403 objection—the basis for that was a 403 objection. It was not a 404(b)." In response to inquiry from the court, the State affirmed that mention of cartel was in text messages leading up to the event. Based on that affirmation, the trial court stated it was adhering to its ruling, that the statements were relevant to what William was saying at the time and was relevant to the witness's frame of mind and whether her fear was reasonable, and "it's consistent with what I had ruled before, even though we took [mention of the cartel] out of the 911 call." The trial court allowed reference to the cartel because "all of that is informing her state of mind and for the reasons I've said now, and for the basis for [Brittany's] fear."

13

In closing, William argued, "[Brittany] also talked about a lot of other things that [are] embellished. She talked about the cartel. That he was messaging her about the cartel. Where is that corroboration? Where is that message?"

2

To prevail on a claim of prosecutorial misconduct, a defendant has the burden of "showing the prosecutor's conduct was both improper and prejudicial in the context of the entire trial." Walker, 182 Wn.2d at 477. To show prejudice, the defendant must show a substantial likelihood that the misconduct affected the jury verdict. Glasmann, 175 Wn.2d at 704.

The trial court, relying on the State's assertions that cartel activity was mentioned in the text messages leading up to the altercation, ruled that testimony of the cartel was admissible because it was relevant to Brittany's frame of mind and whether her fear was reasonable. The trial court was within its discretion to admit this testimony because it was relevant to Brittany's perception of William's threats. See State v. Horn, 3 Wn. App. 2d 302, 310, 415 P.3d 1225 (2018) (a trial court's evidentiary ruling is reviewed for an abuse of discretion). The text messages were admitted and published to the jury; it would not have been improper to allow Brittany to testify about specific text messages. And in her testimony, Brittany indicated the cartel reference was made as part of William's threat in the charged incident. The State's conduct did not violate a pretrial ruling and was not misconduct.

However, our record does not include the text messages that were admitted in evidence, and we therefore cannot confirm the accuracy of the State's indication

to the trial court that they included a reference to the cartel. And during closing argument, William argued there were no messages discussing the cartel. William asked the jury "Where is that corroboration? Where is that message?" If the text messages did not mention the cartel as the State represented, then part of the basis for the trial court's application of its ruling would be undermined.

Even in that case, William would fail to show the requisite prejudice. Brittany mentioned the cartel twice without William raising an objection. It was not until the third mention of the cartel that William objected. Her testimony to which William did not object described the nature of the threats leading up to the incident as opposed to any prejudicial purpose. Additionally, there is no substantial likelihood that the jury believed William threatened Brittany with the cartel, yet chose to convict him of only misdemeanor and not felony harassment. Because William has not shown the necessary prejudice, his claim fails.

IV

William argues the trial court's and prosecutor's errors are prejudicial in the aggregate. We disagree.

Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant their right to a fair trial, even if each error standing alone would be harmless. See State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome. Id. Because any error had no effect on the outcome of the trial, we reject William's claim.

15

V

William argues his conviction violates the First Amendment because the State did not present sufficient evidence that William consciously disregarded a substantial and unjustifiable risk that his conduct would cause harm to another, as required in Counterman v. Colorado, 600 U.S. 66, 78, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023). We disagree.

In Counterman, the U.S. Supreme Court addressed the demands of the First Amendment in a criminal prosecution over a true threat. The court held that a state must prove that the defendant "had some understanding of his statements' threatening character." 600 U.S. at 73. This is determined by "a recklessness standard." Id. at 80. Explaining its selection of the lowest criminal mens rea it considered, the court defined this "[i]n the threats context" as meaning "that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.' " Id. at 79 (quoting Elonis v. United States, 575 U.S. 723, 746, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) (Alito, J., concurring in part and dissenting in part)).

At oral argument, William confirmed that he is not challenging the jury instructions under Counterman, but is challenging only the sufficiency of the evidence. Wash. Ct. of Appeals oral argument, State v. Rains, No. 83871-7-I (September 27, 2023), at 21 min., 19 sec. to 21 min., 37 sec., https://tvw.org /video/division-1-court-of-appeals-2023091219/?eventID=2023091219. Under the Fourteenth Amendment, the evidence is sufficient if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt. <u>State v. Green</u>, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (citing <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)), <u>overruled on other grounds by</u> <u>Washington v. Recuenco</u>, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). The State's evidence was sufficient to satisfy <u>Counterman</u>. The evidence viewed in the light most favorable to the prosecution shows that in the middle of the night William entered the property of Brittany's residence against instructions not to do so, bodily dragged her into his vehicle, placed his hands around her neck, and warned he would see her in the grave. This is sufficient for a rational trier of fact to find he was aware others could regard his statements as threatening violence and delivered them anyway.

VI

William argues the victim penalty assessment and DNA fee are no longer authorized in his case because of statutory amendments. The State concedes remand is appropriate to strike both fees. We accept the State's concession, and remand accordingly.

We affirm William's conviction and remand for the trial court to strike the victim penalty assessment and DNA fee.

_____
Birk, J.

WE CONCUR:

_____     _____
Mann, J.                                Dwyer, J.