**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 22, 2022

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 22, 2022

*Erin L. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>CHAZ ROBERT BUTLER,<br><br>Petitioner. | NO. 100276-9<br><br>EN BANC<br><br><br>Filed : <u>December 22, 2022</u> |

STEPHENS, J.—Chaz Butler, a Black man, was convicted of assaulting two security officers in separate incidents at two Seattle light rail stations. One of the victims, who appears to be white, identified Butler as his assailant at trial. The victim had not made an out-of-court identification. Butler asked the trial court to instruct the jury according to the pattern jury instruction on eyewitness identifications, which includes optional bracketed language that the jury may consider "[t]he witness's familiarity or lack of familiarity with people of the [perceived] race or ethnicity of the perpetrator of the act." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.52, at 218 (5th ed. 2021) (WPIC) (second alteration in original). The trial court agreed to give the pattern jury instruction, but—finding no evidence in the record

*State v. Butler*, No. 100276-9

regarding either the fallibility of cross-racial identification in general or the witness's familiarity or lack of familiarity with people of Butler's race in particular—declined to include that optional language. Butler did not challenge the admissibility of the witness's identification testimony. On appeal, Butler argued that the trial court denied his right to present a defense by failing to give the cross-racial identification portion of the pattern instruction. The Court of Appeals concluded that the trial court did not abuse its discretion because there was insufficient evidence supporting the instruction, and it upheld Butler's conviction.

We affirm. While Butler and supporting amici[1] ask the court to take this opportunity to adopt a model jury instruction on cross-racial eyewitness identifications and to require that instruction be given whenever the defendant requests it, we decline to announce a new rule in this case. Butler did not ask the trial court to give any instruction on cross-racial identification other than the optional language in WPIC 6.52, and he was able to present his defense under the jury instructions given. We adhere to our holding in *State v. Allen*, 176 Wn.2d 611, 294 P.3d 679 (2013) (plurality opinion), recognizing that a trial court's decision of when and how to instruct a jury concerning cross-racial eyewitness identification testimony is reviewed for an abuse of discretion. The trial court did not abuse its

---

[1] The Innocence Project Inc. and the Washington Innocence Project filed a combined amici brief in support of Butler.

2

*State v. Butler*, No. 100276-9

discretion in declining Butler's request to give the bracketed portion of WPIC 6.52 because no evidence was presented supporting the language of that instruction. We leave for another day broader questions about what steps courts should take to mitigate the significant risk that eyewitness identifications are unreliable in the cross-racial context.

## FACTS AND PROCEDURAL HISTORY

The State charged Butler with two assaults that occurred on consecutive days against two different security officers working at light rail stations in the Seattle area. Both assaults were caught on camera, and it appeared to police that the assaults were committed by the same person. A primary issue at trial was the identity of the assailant. The State sought to prove Butler was the person in the videos by showing that Butler was of the same build and race as the assailant and that he wore the same clothes and carried the same items—including the same shoes, skateboard, and backpack. At issue on appeal is the testimony of one of the victims, Michael Bilodeau, who identified Butler in court as the person who assaulted him.

*Two Assaults against Transit Security Officers Are Caught on Camera and Butler Is Arrested*

The first assault occurred on November 2, 2018, against transit security officer, Michael Bilodeau, who was employed by a private security firm, Securitas. The entire incident was captured on video. Bilodeau was working at the Beacon Hill

3

light rail station when he received a report that someone was skateboarding on the light rail platform, which is prohibited as a safety hazard. Bilodeau went to the platform to investigate and "saw a [B]lack male on a skateboard[,] doing tricks." 4 Verbatim Rep. of Proc. (VRP) at 471. When Bilodeau asked the person to stop skateboarding, the person responded by saying, "'F— you.'" 4 VRP at 472.

Bilodeau asked the skateboarder to leave the platform, but he refused. At that time, an unidentified passerby called the skateboarder a "'jackass,'" and the skateboarder became angry and told the passerby, "'I'll kick your ass, old man.'" 4 VRP at 474. Bilodeau attempted to deescalate the situation by telling the skateboarder to leave and that it was not worth a fight. The skateboarder then came directly at Bilodeau and punched him multiple times with a closed fist. Bilodeau's glasses fell off, and his vision blacked out for a few seconds. Bilodeau testified that his interaction with his assailant lasted approximately five minutes. Bilodeau sustained injuries to his lip and jaw, making it difficult to eat for a few days after the incident. He had to take a few weeks off work.

The next day, November 3, 2018, another assault occurred at the Pioneer Square light rail station. Security officer Kurtis Mays reported an assault by a skateboarder at the light rail station. Again, the assault was captured on video. The

skateboarder approached Mays, punched him in the face, dropped Mays to the ground, and broke Mays's bottom denture.

Although police detectives investigated the assaults separately, they watched the videos of both incidents as part of both investigations. The detectives believed that the assaults were committed by the same person. They noted that the assailant appeared to have the same distinctive shoes, skateboard, and backpack in both incidents. They also noticed that the assailant in both videos had some type of facial hair. The detective investigating the Beacon Hill incident stated that the assailant in both assaults appeared to be a Black male. And the detective investigating the Pioneer Square incident stated that the assailant in both videos had a similar build and appeared to be wearing the same shoes, with duct tape on the left shoe.

The detective investigating the Beacon Hill incident took still shots from various videos and distributed these photos to police in an effort to identify the suspect. That detective then created a photomontage of six people, which included a photo of a person the detectives believed was a possible suspect. The photomontage included only Black males, and it did not include Butler. The police showed the montage to Bilodeau, and Bilodeau did not identify any of the men as

his assailant. Bilodeau was never shown a new photomontage with Butler in it, and Bilodeau did not otherwise make any out-of-court identification.[2]

On November 10, 2018, a police officer responding to another call on Capitol Hill made contact with Butler after viewing a photograph of the assailant involved in the two assaults. According to the deputy, Butler appeared to be the same race, gender, and build as the assailant, and had the same skateboard, backpack, and shoes. The deputy described Butler as a Black male, in his mid-20s, over six feet tall, and weighing approximately 200 pounds. The deputy noticed duct tape on one of Butler's shoes, the backpack, and distinctive stickers on the skateboard. The deputy arrested Butler and took him into custody. Based on the two incidents, the State charged Butler with two counts of third degree assault against a security officer under RCW 9A.36.031(1)(b).

### Trial Court Admits the Victim's In-Court Identification

No witness identified Butler as the assailant before he was charged. Bilodeau identified Butler in court for the first time at a pretrial hearing. We give some background on the trial court's ruling admitting that in-court identification to

---

[2] The detective investigating the Pioneer Square assault was unable to meet with the other victim, Mays, after the assault occurred. That detective initially contacted Mays and set up a time and place for Mays to view a photomontage. But Mays did not appear at the agreed meeting place, and police were never able to contact him.

provide context in understanding that the admissibility of Bilodeau's identification is not before this court.

At a pretrial hearing under CrR 3.5 to determine whether some of Butler's statements could be used at trial, the State called Bilodeau and asked him to identify Butler. After Bilodeau identified Butler at that hearing, Butler moved to exclude the use of Bilodeau's identification of him at trial. Counsel argued that the identification was questionable because Bilodeau had identified Butler for the first time at the hearing over a year after the assault and because Butler was the only person of color in the courtroom.

The trial court denied Butler's motion to exclude the in-court identification. The court explained its understanding of the fallibility of eyewitness identifications and concluded that the factors normally bringing those identifications into question—especially suggestive police procedures in out-of-court identifications— were not present for in-court identifications generally. While the trial court allowed Bilodeau to testify to his identification at trial, the judge also underscored that defense counsel could cross-examine Bilodeau about the problems with his identification, including that "Mr. Butler is the only person of color who's seated at one of the counsel tables here." 2 VRP at 118. Butler has not assigned error to that ruling, and the admissibility of Bilodeau's identification is not before the court.

*State v. Butler*, No. 100276-9

*Evidence at Trial Identifying Butler as the Assailant*

At trial, the primary defense theory was that Butler was not the assailant shown in the two videos. As a part of its proof that Butler was the person who committed the assaults, the State asked Bilodeau whether he could identify Butler. Bilodeau testified, "[H]e's sitting at this desk here in between these two gentlemen. He's wearing a light blue button-up shirt. He has black hair, a goatee, beard." 4 VRP at 471. The State also questioned Bilodeau about his encounter with Butler, focusing on his recollection of identifying characteristics of Butler that corresponded with what was shown in the videos. 4 VRP at 479-80 (Bilodeau stated that Butler was wearing "sunglasses," "[a]n orange hoody," "a backpack," "shorts," and "shoes with tape on one of them.").

Butler's counsel extensively cross-examined Bilodeau about the encounter, seeking to undermine the reliability of the identification. Defense counsel questioned Bilodeau about various aspects of the incident:

> Q: And you remember that he was an African-American male?
> A: Yes.
> Q: And he was wearing sunglasses as well?
> A: Yes.
> Q: This might sound obvious, but the sunglasses were on over his eyes?
> A: They were.
> Q: And he had facial hair of sorts?
> A: Yes.
> Q: But you didn't notice any facial features necessarily beyond that?
> A: No.

8

*State v. Butler*, No. 100276-9

Q: And he didn't really stand out to you after the fact?

A: No, it happened so fast. But the bright orange hoody and skateboard, backpack, and tape on their shoe, on his shoe I   mean.

....

Q: Let's start with the skateboard for a moment. So in terms of the skateboard, you remember it being old?

A: Yes.

Q: Maybe beat up a little bit?

A: Yes.

Q: But not much else sticks out to you about it?

A: No.

Q: You don't necessarily remember any stickers that were on the board?

A: I don't, no.

Q: Or any labels that were on the board?

A: No.

Q: You don't remember what brand of skateboard it was?

A: No.

Q: You mentioned shoes a moment ago, so I want to talk about those. So the man who struck you did have shoes on, correct?

A: Yes, he did.

Q: And there may have been tape on them?

A: Yes. I don't remember which side, but there was tape on his shoe.

Q: You don't remember which side?

A: Which shoe. But one of them had tape on it.

Q: And you don't know what brand of shoe this was?

A: No.

Q: And the guy had a backpack on?

A: He did.

Q: But you don't know what the brand [of] the backpack was?

A: No.

Q: Now again, this happened back on November 2nd, 2018, correct?

A: Yes.

Q: That was roughly 14 months ago?

A: Yes.

Q: And at one point in this case, you were given a set of six photos to look at, correct?

A: Yes.

Q: In this set of six photos, you did not see your attacker in them, correct?

*State v. Butler*, No. 100276-9

A: No, I did not.

Q: But at no point were you brought to the light rail station, Pioneer Square station on November 3rd, correct?

A: No, I was not there.

Q: You were not brought to the Capital Hill station on November 10th, correct?

A: No. I was not there either.

Q: You didn't meet with a police sketch artist in this case?

A: No.

Q: And again, your vision did black out when the man who hit you struck you, correct?

A: Yes.

Q: And again, the attack was all over in a matter of seconds?

A: It was.

4 VRP at 492-95.

To prove that Butler committed both assaults, the State presented the videos from each incident; photos of Butler's backpack, skateboard, and shoes; and a booking photo from Butler's arrest. The State also elicited testimony from the detectives who investigated these cases to describe the videos of the two assaults and the commonalities between the images of the assailant. Although the detectives' descriptions of the videos were not identical, they described the commonalities as including the backpack, skateboard, and shoes, in addition to the build and facial hair of the assailant.

*Jury Instruction on Eyewitness Identification Testimony*

Before closing arguments, the court considered the parties' proposed jury instructions. Butler requested the model jury instruction on eyewitness

10

identifications, WPIC 6.52, including the optional bracketed clause on cross-racial identifications. The instruction sets out various factors a jury may consider in assessing the reliability of an eyewitness identification:

> Eyewitness testimony has been received in this trial on the subject of the identity of the perpetrator of the crime charged. In determining the weight to be given to eyewitness identification testimony, in addition to the factors already given you for evaluating any witness's testimony, you may consider other factors that bear on the accuracy of the identification. These may include:
>
> • The witness's capacity for observation, recall and identification;
> • The opportunity of the witness to observe the alleged criminal act and the perpetrator of that act;
> • The emotional state of the witness at the time of the observation;
> • The witness's ability, following the observation, to provide a description of the perpetrator of the act;
> • [*The witness's familiarity or lack of familiarity with people of the* [*perceived*] *race or ethnicity of the perpetrator of the act;*]
> • The period of time between the alleged criminal act and the witness's identification;
> • The extent to which any outside influences or circumstances may have affected the witness's impressions or recollection; and
> • Any other factor relevant to this question.

WPIC 6.52 (emphasis added)(alterations in original).

The trial court gave the jury the eyewitness identification instruction but denied Butler's request to include the bracketed language specific to cross-racial identifications. The trial court explained its decision at length, beginning by discussing its understanding of the leading case that predated the pattern instruction, *Allen*, 176 Wn.2d 611:

*State v. Butler*, No. 100276-9

I adhere to what I said yesterday that a good deal of the evidence in this case is not eyewitness oriented; it's direct. The question for the jury is going to be whether or not they think that the identification evidence of the defendant's own identification and the videotape evidence line up with each other.

. . . .

. . . But nonetheless, it's an in-court identification, which is one of the factors that the *Allen* court looked at as to whether or not that's in play. And it's a cross-racial identification, which is a big source of discussion in the *Allen* case, as it was below in the Court of Appeals and in Judge Doyle's court [the trial court in *Allen*].

As I read the case law, the court clearly said when you have multiple factors in play, some of which play against instructing on eyewitness identification, it's really a call for the court. And the big thing that the court should avoid at all costs is commenting on the evidence. That's the primary flaw of the disapproved eyewitness identification instructions the courts have given is that they're so strong that they actually amount to a court commenting and says, you know, "view with caution" essentially. . . .

6 VRP at 651-53.

After hearing argument from the parties, the trial court discussed the lack of evidence in the case about cross-racial identifications, either with regard to their fallibility generally or with respect to Bilodeau's testimony specifically:

But here's what I don't have: (a) I don't have any kind of expert here. And that's something the court has talked about. And (b) I don't really have any evidence that Mr. Bilodeau does or doesn't have familiarity with people of Mr. Butler's ethnicity.

And I will tell you, the fact that Mr. Bilodeau didn't just jump in and make an identification of somebody African-American in a montage presented to him by an officer who thought he might have the

12

perpetrator, you know, suggests to me that he has some ability to distinguish between people who are Caucasian and people who are African-American.

6 VRP at 656.  The court had concerns about the jury speculating on the reliability of Bilodeau's cross-racial identification of Butler without evidentiary support.  The court concluded there needed to be something in the record indicating Bilodeau's familiarity or lack of familiarity with people of different races in order to give the bracketed portion of WPIC 6.52.  In explaining its decision against providing a cross-racial identification instruction merely because Bilodeau appeared to be white and Butler was Black, the court stated:

> The problems with cross-racial identification emerge from a more segregated time in American life. I'm not claiming that we have moved past that time but there's less segregation in our community than there used to be. And surely you folks who are younger than me have noticed that too as you've gotten older, that the community around you everywhere has gotten more diverse than it used to be. Certainly in our area, in the greater Seattle area where we all live and practice.

> So, you know, I think you have to have something in the record other than the fact that somebody appears to be Caucasian or that somebody appears to be African-American from which to make an inference. And I just don't have that here.

6 VRP at 661.  The court gave the jury the eyewitness identification instruction without including the bracketed portion regarding cross-racial identification.

*Closing Arguments*

In its closing argument, the State reminded the jury that Bilodeau's testimony was not the only evidence it could rely on to identify Butler as the assailant. The State highlighted the videos, noting that the assailant's physical features, clothing, and personal items in the videos matched Butler at the time of his arrest. 6 VRP at 690 ("But the testimony is not the only evidence you have in this case because now you have all seen the assaults on these officers. . . . You also saw footage of Mr. Butler coming and going, so you were able to see the distinct personal property he had with him on both occasions: his skateboard, his backpack, and his shoes.").

Butler's counsel argued in closing that Butler had been misidentified and was not the assailant from the video. Defense counsel repeatedly emphasized the evidence calling into question the reliability of Bilodeau's in-court identification. 6 VRP at 703 ("And you know that Chaz Butler is not the man responsible for these crimes because the one person who did identify them in person, Michael Bilodeau, did so 14 months after he made contact with the man who attacked him, 14 months after never having been asked to make a single identification, 14 months after he admitted to you that his vision blacked out and his glasses fell off."), 707 ("Mr. Bilodeau told us that when the attack happened, he was dazed, he lost vision, it was over in a matter of seconds. He doesn't really [remember] much of what happened once it started."). Defense counsel also noted that Bilodeau never made any

identification of his assailant until he was in the courtroom, and counsel specifically

pointed out the nature of the cross-racial identification to undermine its credibility:

> On November 10th, when they found Mr. Butler, they didn't ask him if this was the man. They didn't in the intervening time put Mr. Butler's face in a six pack . . . to ensure that it was compared with other faces, that they could do it one at a time to guard against bias. . . .

> He told you that he had never made any identification in this case until this trial. And when he was asked if this was the man who did it, the only African-American sitting in this courtroom at defense counsel table, having never made any identification at this point, he said, "Yes, he is."

> Ladies and gentlemen, your common sense tells you that that is not a sound identification, that that is a reason to doubt his credibility.

> . . . .

> . . . And his overconfidence in that, his apparent infallibility to his own biases both implicit and explicit, like we talked about in voir dire, that gives you reason to doubt that he can accurately identify the man who struck him.

6 VRP at 708-09.  The court allowed the jury to examine the exhibits in the jury

room, including Butler's backpack, skateboard, and shoes.  During its deliberations,

the jury requested to examine the physical items and view the videos at the same

time, which the court allowed in open court.  The jury found Butler guilty on both

charges.

*State v. Butler*, No. 100276-9

*Appellate Procedural History*

Butler appealed his convictions, arguing, inter alia*,* that the trial court abused its discretion by refusing to give the jury instruction concerning cross-racial eyewitness identification.  In an unpublished opinion, Division One of the Court of Appeals rejected Butler's arguments and affirmed his convictions.  *State v. Butler*, No. 81024-3-I, slip op. at 8-9 (Wash. Ct. App. Aug. 2, 2021) (unpublished), http://www.courts.wa.gov/opinions/pdf/810243.pdf.  The Court of Appeals recognized that a trial court's decision on whether to give a cross-racial identification instruction is reviewed for an abuse of discretion and that the analysis should be guided by this court's decision in *Allen*.  *Id.* slip op. at 8 (citing *Allen*, 176 Wn.2d at 624-26 (lead opinion)).  Because the Washington Pattern Instructions (WPI) Committee expressed concern that an instruction could, in certain circumstances, amount to an unconstitutional comment on the evidence, the Court of Appeals reasoned that the trial court "correctly concluded that the language relating to cross-racial identification may or may not be appropriate, depending on the evidence presented at trial."  *Id.* slip op. at 9.

Because there was no evidence presented at Butler's trial regarding either the fallibility of cross-racial identifications generally or Bilodeau's familiarity with Black people, the Court of Appeals agreed with the trial court that no evidence supported giving a specific instruction on cross-racial identification.  *Id.* slip op. at

16

9-10. Therefore, the trial court did not abuse its discretion in declining to give the instruction. *Id*. slip op. at 10. Finally, the Court of Appeals highlighted that despite not having the instruction he requested, Butler was able to pursue his defense and attack the reliability of Bilodeau's identification during both cross-examination and in closing. *Id*.

Butler petitioned for discretionary review, and this court granted review on the question of whether Butler "was entitled to a cross-racial eyewitness identification jury instruction." Ord. No. 100276-9 (Wash. Feb. 2, 2022).

ANALYSIS

Racial bias is pervasive in our society, and the ways in which it can impact eyewitness identifications are well established. *See Allen*, 176 Wn.2d at 616 (lead opinion) ("Concerns and discussions over the reliability of eyewitness identifications, and more specifically cross-racial eyewitness identifications, have arisen in cases for some time."); *see also State v. Derri*, 199 Wn.2d 658, 675, 511 P.3d 1267 (2022) (noting, "we now know that cross-racial identifications can be particularly unreliable—studies show that rates of error in making identifications are much higher when a person is asked to identify someone of another race"); Laura Smalarz & Gary L. Wells, *Eyewitness-Identification Evidence: Scientific Advances and the New Burden on Trial Judges*, 48 CT. REV. 14, 14 (2012) ("Research

consistently shows that cross-race identifications are less reliable than are within-race identifications.").

Studies have confirmed the particular impact of cross-racial bias on eyewitness identifications of Black persons by white persons: "One of the oldest and most consistent findings of systematic studies of eyewitness identification is that white Americans are much more likely to mistake one [B]lack person for another than to mistakenly identify members of their own race." SAMUEL R. GROSS ET AL., NAT'L REGISTRY OF EXONERATIONS, RACE AND WRONGFUL CONVICTIONS IN THE UNITED STATES 12 (2017).

At the same time, we know that "much eyewitness identification evidence has a powerful impact on juries." *Watkins v. Sowders*, 449 U.S. 341, 352, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981). Likely because of the persuasive value of eyewitness identifications, mistaken identifications have been a leading cause of wrongful convictions. *See State v. Riofta*, 166 Wn.2d 358, 371, 209 P.3d 467 (2009).

We therefore begin by recognizing the need for courts to find ways to mitigate cross-race bias in eyewitness identifications and to update our standards when appropriate. In his supplemental brief, Butler urges the court to fashion a new model instruction "that provides the jury with the information they need to analyze eyewitness testimony properly." Suppl. Br. at 33. In other portions of the briefing, we are urged to update the standard for determining the admissibility of in-court

18

eyewitness identifications, as some courts have done. *See id*. at 13-15; Amici Curiae Br. of the Innocence Project, Inc. et al. at 15-20 (citing *State v. Lawson*, 352 Or. 724, 749-63, 291 P.3d 673 (2012) (updating Oregon's standard for admitting eyewitness identifications under Oregon's evidence rules to ensure more reliable identifications)).

While the briefing appropriately draws attention to possible approaches to addressing cross-racial bias in eyewitness identifications, this case does not provide the occasion for us to consider new jury instructions or a change to current admissibility standards.[3] We granted review on the issue of whether the trial court erred by refusing Butler's request to include additional bracketed language in the eyewitness identification instruction given, WPIC 6.52. Butler assigned error to the omission of that language, not to the admission of Bilodeau's in-court identification testimony. Nor did he propose an alternative, new instruction. Our review is therefore limited to considering whether the requested additional language in the pattern instruction should have been given.

Butler argues the trial court violated his right to present his defense under the due process clauses of the state and federal constitutions by declining to give the

---

[3] The court recently updated the standard for the admissibility of eyewitness identifications that may be affected by suggestive police procedures, holding "that courts must consider new, relevant, widely accepted scientific research when determining the suggestiveness and reliability of eyewitness identifications." *Derri*, 199 Wn.2d at 663.

instructional language regarding cross-racial identifications. "A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022) (citing U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010)). "'The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.'" *Jones*, 168 Wn.2d at 720 (quoting *Chambers*, 410 U.S. at 294). A criminal defendant "is entitled to have the jury instructed on [their] theory of the case if there is evidence to support that theory." *State v. Williams*, 132 Wn.2d 248, 259-60, 937 P.2d 1052 (1997).

When the trial court determines there is insufficient evidence in the record to justify giving a jury instruction requested by the defense, appellate courts first review that evidentiary ruling for abuse of discretion and then analyze de novo whether the exclusion of that specific jury instruction violated the defendant's right to present a defense. *State v. Arbogast*, 199 Wn.2d 356, 380, 506 P.3d 1238 (2022) (citing *State v. Arndt*, 194 Wn.2d 784, 797, 798-813, 453 P.3d 696 (2019)).

While Butler correctly identifies the value of instructing juries about the fallibility of cross-racial eyewitness identifications generally, we hold that he is not

20

entitled to a new trial due to the absence of an instruction here. The trial court reasonably exercised its discretion not to give the bracketed language of WPIC 6.52 based on the facts before it, specifically the absence of any evidence about Bilodeau's familiarity with people of different races or "explaining the scientific foundation for cross-race bias." *Allen*, 176 Wn.2d at 625 (lead opinion). Moreover, Butler was able to attack Bilodeau's credibility and pursue his defense based on the unreliability of the identification under the instructions that were given. We therefore affirm Butler's convictions and reserve consideration of the broader questions for another day.

I. The Trial Court Did Not Abuse Its Discretion by Refusing To Include WPIC 6.52's Optional Language Regarding Cross-Racial Identifications

Butler argues the trial court abused its discretion by refusing to give the requested instruction on cross-racial identification because there was "'some evidence'" to support that instruction. Suppl. Br. at 8 (quoting *State v. Fisher*, 185 Wn.2d 836, 852, 374 P.3d 1185 (2016)); *see Arbogast*, 199 Wn.2d at 370 ("We take the opportunity to clarify that regardless of the terms used, the quantum of proof justifying an instruction on a party's theory of the case is some evidence supporting the proposition."). The State replies that the trial court properly exercised its discretion under this court's precedent because there "was no evidence to support" the requested instruction, the cross-racial identification "was not central to the case,"

*State v. Butler*, No. 100276-9

and "[t]he identification was amply corroborated." Suppl. Br. of Resp't at 31. We agree with the State.

"A court abuses its discretion when an 'order is manifestly unreasonable or based on untenable grounds.'" *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 668, 260 P.3d 874 (2011)). This may occur when a trial court decision "is unsupported by the record." *Id.* "A reviewing court may not find abuse of discretion simply because it would have decided the case differently—it must be convinced that '*no reasonable person* would take the view adopted by the trial court.'" *Id.* (internal quotation marks omitted) (quoting *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)). We review whether the evidence was sufficient to support the instruction "in the light most favorable to the party that requested the instruction." *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

While a defendant "is entitled to have the jury instructed on [their] theory of the case if there is evidence to support that theory," *Williams*, 132 Wn.2d at 259, a defendant is not entitled to a specific instruction on their theory, such as the instruction Butler requested in this case. Even if the defendant prefers a specific instruction, that "'specific instruction need not be given when a more general instruction adequately explains the law and enables the parties to argue their theories

22

of the case.'" *State v. Brown*, 132 Wn.2d 529, 605, 940 P.2d 546 (1997) (quoting *State v. Rice*, 110 Wn.2d 577, 603, 757 P.2d 889 (1988)).

Our decision in *Allen* is the leading Washington case addressing how a trial court should determine whether to give a cross-racial eyewitness identification instruction. Although there was no majority opinion in *Allen*, its holdings can be identified. The court unanimously recognized that a specific instruction is not required in every case involving a cross-racial identification and that courts must exercise discretion based on the facts of each case. 176 Wn.2d at 626 (lead opinion) ("We decline to adopt a general rule requiring the giving of a cross-racial instruction in cases where cross-racial identification is at issue, and the trial court did not abuse its discretion by refusing to give a cautionary cross-racial jury instruction under the facts of this case."), 633 (Madsen, C.J., concurring) ("The identification here simply did not implicate the type of physical characteristics that give rise to erroneous cross-racial identifications or the need for an instruction."), 634 (Chambers, J., concurring in result) ("The cross-racial instruction is correct and will be necessary from time to time to instruct the jury on the dangers of cross-racial identification."), 637 (Wiggins, J., dissenting) ("I agree with the lead opinion that we need not adopt an across-the-board rule requiring a cross-racial identification instruction in every case potentially raising the issue."). As Justice Wiggins aptly stated in his dissent, "The most important lesson of this case is that every member of this court would support

23

giving a cross-racial identification instruction in an appropriate case—but we differ on what constitutes an appropriate case." *Id.* at 635-36.

Following *Allen*, the WPI Committee carefully crafted a model instruction for eyewitness identifications and included an optional cross-racial identification provision in brackets. That bracketed instruction provides that in determining the accuracy of an eyewitness identification, the jury may consider "[t]he witness's familiarity or lack of familiarity with people of the [perceived] race or ethnicity of the perpetrator of the act." WPIC 6.52 (second alteration in original). The comment to that bracketed instruction highlights that it was written to avoid judicial comments on the evidence, that trial courts have discretion in giving the cross-racial instruction, and that "the *Allen* opinions . . . should be carefully reviewed in determining whether this factor must or should be included." WPIC 6.52 cmt.

In this case, Butler's defense was that he was not the person who committed the charged assaults. In light of Bilodeau having identified Butler as his assailant in court, Butler asked the trial court to give WPIC 6.52 with the optional bracketed language on cross-racial eyewitness identification testimony. The trial court exercised its discretion to give the instruction without that optional language because there was no evidence about the reliability of cross-racial identifications in general and no "evidence that Mr. Bilodeau does or doesn't have familiarity with people of Mr. Butler's ethnicity." 6 VRP at 656; Clerk's Papers at 117.

24

We hold that the trial court did not abuse its discretion in declining to give the bracketed language in the pattern instruction. The court reasonably concluded that there was not sufficient evidence in the record supporting such a jury instruction. *See Arbogast*, 199 Wn.2d at 370. The trial court correctly observed that no evidence was presented regarding Bilodeau's familiarity with people of Butler's race or about the reliability of cross-racial identifications in general. Without such evidence, there was simply nothing in the record the jury could rely on to properly apply the instruction to the facts. Because the instruction's language could have invited the jury to speculate about Bilodeau's "familiarity or lack of familiarity" with people of Butler's race without any support in the record, the trial court acted within its discretion in declining to give that instruction. WPIC 6.52.

Our holding should not be misconstrued to suggest that a trial court would necessarily abuse its discretion by *giving* a cross-racial identification instruction on similar facts. Our decision is limited to the specific language of WPIC 6.52 and the evidence in this case, which the trial court sustainably concluded did not warrant the instruction. We do not express any opinion about more general instructions on cross-racial identifications that may be requested in future cases or the evidence that may be sufficient to justify such instructions. But the fact that an identifying witness is of a different race from the defendant is not itself determinative of whether an instruction must be given. This point is underscored by our decision in *Allen*.

Similar to the identification made in *Allen*, Bilodeau's identification was primarily made through identifying characteristics unrelated to Butler's race, specifically his clothing and the items he carried. 176 Wn.2d at 625 (lead opinion) (concluding that "a specific cross-racial identification instruction would not have been helpful in a case like this where the witness/victim's identification was based on identifying factors unrelated to cross-race bias"), 632 (Madsen, C.J., concurring) (noting that an instruction would be justified when the identification is "based upon facial features or other specific physical characteristics beyond the mere fact that Allen is African American"). The State presented ample evidence of Butler's identity as the assailant that corroborated Bilodeau's in-court identification of Butler. *See id*. at 635 (Chambers, J., concurring in result) (noting that an instruction would be warranted when "there is little evidence corroborating the identification"), 637 (Wiggins, J., dissenting). The assaults were caught on video, which clearly showed the assailant in possession of a skateboard, backpack, and shoes, all of which had distinctive features. When Butler was arrested, he had these same distinctive items in his possession. During deliberations, the jury asked to examine these items and compare them directly to the videos of the assaults, even asking court staff to stop the videos at certain key moments. Each of the opinions in *Allen* make clear that the threshold determination for giving a cross-racial instruction must be based on something in the

26

record beyond the fact that an identifying witness was of a different race from the defendant.

Even though the trial court did not abuse its discretion under our precedent, Butler maintains that the trial court's failure to give the optional bracketed language on cross-race bias violated his due process right to present a defense. However, as Butler was permitted to undermine Bilodeau's identification—including on the basis of racial bias—he was permitted to argue his theory of the case.

II.  The Jury Instructions Sufficiently Allowed Butler To Present His Defense and Challenge the Reliability of Bilodeau's Identification Testimony

Butler argues that the trial court's refusal to include the optional language in WPIC 6.52 violated his due process rights because it "deprived [him] of his ability to present his defense and left the jury with no guidance on how to reliably assess [Bilodeau's cross-racial] identification" testimony. Suppl. Br. at 1. We disagree.

We review claims that an omitted jury instruction violated the defendant's right to present a defense de novo. *Arbogast*, 199 Wn.2d at 380 (citing *Arndt*, 194 Wn.2d at 797). "Jury instructions are constitutionally adequate 'when, taken as a whole, they properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue [their] theory of the case.'" *State v. Knapp*, 197 Wn.2d 579, 586, 486 P.3d 113 (2021) (quoting *State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999)).

27

*State v. Butler*, No. 100276-9

In light of Bilodeau's in-court identification of Butler, the trial court instructed the jury pursuant to WPIC 6.52, except for the optional language regarding cross-racial identification. To show that the trial court deprived him of his ability to present his defense, Butler must show that WPIC 6.52, without that optional language, did not permit him to argue that he is not the person who committed the charged assaults. This he cannot do.

Even without the optional language regarding cross-racial identification, WPIC 6.52 fully allowed Butler to challenge the reliability of Bilodeau's identification testimony. WPIC 6.52 informed the jury that they could consider a list of six "factors that bear on the accuracy of the [eyewitness] identification" as well as "[a]ny other factor relevant to this question." This jury instruction did not preclude Butler from arguing that Bilodeau's in-court identification of Butler was unreliable. In fact, much of Butler's closing argument focused on a number of reasons why the jury should not trust Bilodeau's identification. 6 VRP at 703 ("And you know that Chaz Butler is not the man responsible for these crimes because the one person who did identify them in person, Michael Bilodeau, did so 14 months after he made contact with the man who attacked him, 14 months after never having been asked to make a single identification, 14 months after he admitted to you that his vision blacked out and his glasses fell off."), 707 ("Mr. Bilodeau told us that when the attack happened, he was dazed, he lost vision, it was over in a matter of

28

seconds. He doesn't really [remember] much of what happened once it started. He told you that this was [not] somebody he'd seen before"). Defense counsel also specifically pointed out the cross-racial nature of the identification to undermine its credibility:

> On November 10th, when they found Mr. Butler, they didn't ask [Bilodeau] if this was the man. They didn't in the intervening time put Mr. Butler's face in a six pack . . . to ensure that it was compared with other faces, that they could do it one at a time to guard against bias. . . .
>
> [Bilodeau] told you that he had never made any identification in this case until this trial. And when he was asked if this was the man who did it, the only African-American sitting in this courtroom at defense counsel table, having never made any identification at this point, he said, "Yes, he is."
>
> Ladies and gentlemen, your common sense tells you that that is not a sound identification, that that is a reason to doubt his credibility.
>
> . . . .
>
> . . . And his overconfidence in that, his apparent infallibility to his own biases both implicit and explicit, like we talked about in voir dire, that gives you reason to doubt that he can accurately identify the man who struck him.

6 VRP at 708-09. Under the instructions given, Butler was fully able to present his defense and attack the reliability of Bilodeau's in-court identification testimony, including based on racial bias.

III.    We Reaffirm *Allen*'s Recognition That Trial Courts Must Exercise Discretion in Deciding When To Give a Jury Instruction on Cross-Racial Eyewitness Identification

*State v. Butler*, No. 100276-9

Both parties recognize *Allen* as the controlling case on the issue of cross-racial identification jury instructions. *See* Suppl. Br. at 18-21; Suppl. Br. of Resp't at 25-31. Nonetheless, for the first time in this court, Butler broadly asserts that "due process requires the [trial] court to provide the jury with an instruction on cross-racial identification." Suppl. Br. at 37. Butler's arguments for a categorical rule echo those we unanimously rejected in *Allen*. *Compare Allen*, 176 Wn.2d at 621 ("[Allen] argues the scientific data regarding the unreliability of eyewitness identification, and of cross-racial eyewitness identification in particular, is now irrefutable. . . . Based on this data, Allen asks us to adopt a rule of general application, founded in notions of due process, that in cases involving cross-racial eyewitness identification it is reversible error to fail to instruct on cross-racial identification when requested."), *with* Suppl. Br. at 1 ("With consensus among experts that people have difficulty with cross-racial identification, the risk of mistaken identification is high when a person attempts to identify someone of a different race. To reduce the likelihood of wrongful convictions, this Court should adopt a rule requiring a cross-racial identification instruction when the defendant and the witnesses are of different races and the defense requests one.").

As discussed above, Butler's arguments at trial and in the Court of Appeals were framed in terms of the abuse of discretion standard and his right to present a defense. In his petition for review, however, he suggests that "[i]f *Allen* stands for

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the principle that Mr. Butler was not entitled to a cross-racial identification instruction under the circumstances of this case, it is time for *Allen* to be reexamined." Pet. for Rev. at 18. Given the posture of this case and the lack of briefing addressing the governing standards for overturning precedent, we decline Butler's invitation to reexamine or overrule *Allen*. We reaffirm *Allen*'s core holding that a trial court's decision to not give a cross-racial instruction is reviewed for abuse of discretion. We briefly address Butler's arguments about the propriety of *Allen*'s holding.

"Generally, under stare decisis, we will not overturn prior precedent unless there has been 'a clear showing that an established rule is incorrect and harmful.'" *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014) (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)). We may also "reconsider our precedent . . . when the legal underpinnings of [that] precedent have changed or disappeared altogether." *Id.* at 66-67 (citing *United States v. Gaudin*, 515 U.S. 506, 521, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)).

Butler does not attempt to argue that *Allen* is incorrect and harmful or that its legal underpinnings have eroded.[4] Butler instead argues "*Allen* does not remedy the

---

[4] Butler briefly suggests that *Allen* is not precedential because there is no majority opinion. Pet. for Rev. at 18. Butler overlooks the fact that every opinion in *Allen* recognized that

problem of [cross-racial] misidentification" because, "[s]ince *Allen*, Washington's courts have not given the instruction." Suppl. Br. at 18, 20. In support of his claim, Butler states that "[i]n every case where the Court of Appeals reviewed whether a cross-racial instruction was necessary, it held that it was not an abuse of discretion for the trial court to refuse to give the instruction." *Id.* at 20. "These cases," Butler insists, "demonstrate that unless this Court requires an instruction, it is unlikely any court will give it." *Id.* at 20-21.

However, the five cases Butler cites do not substantiate this criticism. In two of those cases, the defense never requested a cross-racial identification instruction. *See State v. Turriziani*, No. 79337-3-I, slip op. at 9 (Wash. Ct. App. June 15, 2020) (unpublished) ("Turriziani has not shown that his constitutional rights were violated by the court's failure to give a cross-racial identification instruction when he did not request that instruction."), http://www.courts.wa.gov/opinions/pdf/793373.pdf; *State v. Jones*, No. 41902-5-II, slip op. (unpublished portion) at 23 n.11 (Wash. Ct. App. June 4, 2013) ("We note that *Allen* was primarily concerned with cross-racial identification, which is not at issue in this case."),

---

trial courts retain discretion in deciding when to give a cross-racial eyewitness identification jury instruction. In doing so, each opinion rejected *Allen*'s argument that "notions of due process" always require trial courts "to instruct [the jury] cross-racial identification when requested" by the defense. *Allen*, 176 Wn.2d at 621 (lead opinion). Because this point of law is reflected in all of the opinions concurring in the judgment as well as the dissent, it constitutes precedent.

*State v. Butler*, No. 100276-9

http://www.courts.wa.gov/opinions/pdf/D2%2041902-5-II%20Part%20Published%20Opinion.pdf.   In  another,  there  was  no  eyewitness  identification at all.  *State v. Reichow*, No. 50289-5-II, slip op. at 8 (Wash. Ct. App. Mar. 19, 2019) (unpublished) ("Here, the witnesses' testimonies to which [the defense] sought to apply the proposed eye witness instruction . . . did not identify Reichow."),                          http://www.courts.wa.gov/opinions/pdf/D2%2050289-5-II%20Unpublished%20Opinion.pdf.   Only two of the cases Butler cites actually involved a cross-racial identification instruction—and neither of those involved the pattern jury instruction adopted after *Allen* but, instead, concerned novel instructions proposed by the defendants.  *See State v. Wilson*, No. 46771-2-II (Wash. Ct. App. Dec.  22,  2015)  (unpublished),  http://www.courts.wa.gov/opinions/pdf/46771-2.15.pdf;  *State  v.  Berrian*,  No.  45922-1-II  (Wash.  Ct.  App.  Aug.  18,  2015) (unpublished),           http://www.courts.wa.gov/opinions/pdf/D2%2045922-1-II%20Unpublished%20Opinion.pdf.  More to the point, the cited cases cannot tell the whole story, including instances in which trial courts have given an instruction and the issue did not arise on appeal or the appellate court affirmed.  *See, e.g.*, *State v.  Hull*,  No.  51037-5-II  (Wash.  Ct.  App.  Apr.  30,  2019)  (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2051037-5-II%20Unpublished%20Opinion.pdf (holding the trial court properly instructed the jury on cross-racial identifications).  All this limited body of developing law may

33

*State v. Butler*, No. 100276-9

reveal is that appellate courts recognize that trial judges have discretion under *Allen* to give an appropriate instruction when requested.

Butler also argues we should overturn *Allen* because, "[u]nlike when this Court issued its opinion in *Allen*, it is now clear an instruction will help jurors understand the dangers of [cross-racial] misidentification." Suppl. Br. at 30. Butler supports this claim with citations to social science research and decisions from seven of our sister states. *Id.* at 9-18. However, Butler's citations do not justify overturning our precedent.

First, none of the "new" social science Butler identifies supports the claim that our understanding of cross-racial bias has meaningfully changed in the years since we decided *Allen*. Only two of the social science publications Butler relies on were published after *Allen*, and one of those publications explicitly contradicts this claim. *See* John C. Brigham et al., *The Influence of Race on Eyewitness Memory*, *in* 2 HANDBOOK OF EYEWITNESS PSYCHOLOGY 257-58 (Rod C.L. Lindsey et al. eds., 2014) ("Although observations involving race and face recognition have been documented since the early twentieth century, the past 30 years have been rich with empirical studies demonstrating the perils of witnesses attempting to identify perpetrators of another race." (citations omitted)) [https://perma.cc/2C6R-FBZC]. Butler has not established any development in the current social science that justifies a departure from *Allen*.

34

*State v. Butler*, No. 100276-9

Second, Butler's reliance on decisions from our sister states fails to recognize that none of these states' constitutions contain provisions like our constitution's prohibition on judges commenting on the evidence when instructing the jury. *See* WASH. CONST. art. IV, § 16 ("Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."). The comment to WPIC 6.52 notes that the cross-racial identification instruction is not intended as a general cautionary instruction about the fallibility of cross-racial identifications. WPIC 6.52 cmt. ("Although this is commonly referred to as 'cross-racial identification,' the WPI Committee has phrased this bracketed factor somewhat differently both to avoid commenting on the evidence and also to leave it to the jury to evaluate the particular witness's basis for his or her conclusion."). The WPI Committee consciously departed from California's instruction on cross-racial identifications, which provides that the jury may broadly consider "[t]he cross-racial or ethnic nature of the identification." *People v. Wright*, 45 Cal. 3d 1126, 1166, 755 P.2d 1049, 248 Cal. Rptr. 600 (1988); WPIC 6.52 cmt. The difference in these instructions reflects constitutional differences because Washington's constitution prohibits judicial commentary on the evidence, while California's constitution explicitly permits such commentary. *Compare* WASH. CONST. art. IV, § 16, *with* CAL. CONST. art. VI, § 10 ("The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination

35

of the cause."). Butler does not explain how the approaches adopted by our sister states, some of which expressly authorize judicial comments, are compatible with our constitution.

The abuse of discretion standard announced in *Allen* strikes a balance between the right of an accused to present a defense and the risk of the court making an unconstitutional comment on the evidence. While *Allen* concluded that cross-racial identification instructions do not, in general, violate Washington's prohibition on judicial commentary on the evidence, 176 Wn.2d at 624 n. 7 (lead opinion), the court's recognition that such instructions are not constitutionally required also reflects deference to the jury's role in determining the reliability of an eyewitness identification. By giving an instruction only when the jury can apply it based on the evidence presented, trial courts avoid invading the jury's role in analyzing the evidence as well as any possible unconstitutional judicial comment on the evidence that conveys "a personal opinion of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial." *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970).

For all of these reasons, we reject Butler's invitation to overturn *Allen*. Butler does not show that *Allen* was incorrect and harmful and should be abandoned in favor of a rule that would require giving a cross-racial identification instruction whenever the defendant requests one. The existing analytical framework in *Allen*

appropriately respects the trial court's discretion to decide when a cross-racial identification instruction is needed, consistent with the defendant's right to present their defense. Under *Allen*, Butler's contention that the trial court abused its discretion and violated his right to present a defense by declining to give this instruction fails.

CONCLUSION

The trial court did not abuse its discretion in declining to instruct the jury using the optional bracketed language in WPIC 6.52 because there was not sufficient evidence to support giving that instruction. Under the instructions given, Butler was able to present his defense, consistent with his Sixth Amendment rights. We decline Butler's request to consider issues beyond the scope of review or to reexamine or overrule our decision *Allen*. We affirm the Court of Appeals and uphold Butler's conviction.

*State v. Butler*, No. 100276-9

_____
Stephens, J.

WE CONCUR:

_____
                                                Gordon McCloud, J.

_____
Johnson, J.

_____
Madsen, J.

_____
                                                Whitener, J.

_____
Owens, J.

_____
                                                Lewis, J.P.T.

*State v. Butler*, No. 100276-9 (González, C.J., concurring)

No. 100276-9

GONZÁLEZ, C.J. (concurring) — Mistaken eyewitness identifications have resulted in many innocent people being wrongfully convicted in our nation. *See People v. Boone*, 30 N.Y.3d 521, 528, 91 N.E.3d 1194, 69 N.Y.S.3d 215 (2017); *see also United States v. Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (noting that the "vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"). The particular weaknesses of cross-racial identifications have been well known and well documented for decades. *Boone*, 30 N.Y.3d at 528 (citing Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCHOL., PUB. POL'Y & L. 3, 15 (2001)).

*State v. Butler*, No. 100276-9 (González, C.J., concurring)

The Innocence Project reports that of the 375 people convicted of crimes who were later exonerated by DNA (deoxyribonucleic acid) testing, 69 percent involved eyewitness misidentification. *DNA Exonerations in the United States*, INNOCENCE PROJECT, https://www.innocenceproject.org/dna-exonerations-in-the-united-states. Of these, 42 percent involved cross-racial identification. *Id.* According to one study, "cross-racial identifications were 1.56 times more likely to be incorrect than same-race identifications. Conversely, subjects were 2.2 times more likely to accurately identify a person of their own race than a person of another race." *State v. Lawson*, 352 Or. 724, 775, 291 P.3d 673 (2012) (citing Meisner & Brigham*, supra*, at 15-16).

It is also well documented that jurors rely far too much on eyewitness testimony. "'[T]here is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says "That's the one!"'" *Watkins v. Sowders*, 449 U.S. 341, 352, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981) (Brennan, J., dissenting) (quoting ELIZABETH F. LOFTUS, EYEWITNESS TESTIMONY 19 (1979)). "'[E]yewitness evidence presented from well-meaning and confident citizens is highly persuasive but, at the same time, *is among the least reliable forms of evidence*.'" *United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) (alteration in original) (quoting A. Daniel Yarmey, *Expert Testimony: Does Eyewitness Memory Research Have Probative Value for the Courts?*, 42

2

*State v. Butler*, No. 100276-9 (González, C.J., concurring)

CANADIAN PSYCHOL. 92, 93 (2001)). While the judicial system is well acquainted with these factors, many jurors are not. Richard S. Schmechel, Timothy P. O'Toole, Catharine Easterly & Elizabeth F. Loftus., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 JURIMETRICS J. 177, 200 (2006) [http://perma.cc/5HV7-G9BU]. Almost half of jurors in one study incorrectly believed that cross-race and same-race identifications are equally reliable. *Id.*

Judges in our state have been extraordinarily reluctant to instruct juries about these well-known facts, perhaps out of fear that they are violating our constitution's injunction against commenting on the evidence. *See* WASH. CONST. art. IV, § 16. But the purpose of article 16 is to prevent the trial judge's opinion of the facts from influencing the jurors. *See State v. Cerny*, 78 Wn.2d 845, 855, 480 P.2d 199 (1971) (citing *State v. Brown*, 31 Wn.2d 475, 197 P.2d 590, 202 P.2d 461 (1948)), *vacated in part on other grounds*, 408 U.S. 939, 92 S. Ct. 2873, 33 L. Ed. 2d 761 (1972) (mem.). Instructing the jurors on the weakness of cross-racial identification is no more a comment on the evidence than instructing the jury on the meaning of direct and circumstantial evidence. *Cf. State v. Reed*, 56 Wn.2d 668, 675, 354 P.2d 935 (1960).

Since we know that cross-racial identifications are regularly infected with error, we have an obligation to do something about it. As we recognized in our

*State v. Butler*, No. 100276-9 (González, C.J., concurring)

June 4 letter, we must "develop a greater awareness of our own conscious and

unconscious biases in order to make just decisions in individual cases, and we can

administer justice and support court rules in a way that brings greater racial justice

to our system as a whole." Letter from Wash. Sup. Ct. to Members of Judiciary &

Legal Cmty. 1 (June 4, 2020)*,*

https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Ju

diciary%20Legal%20Community%20SIGNED%20060420.pdf

[https://perma.cc/QNT4-H5P7].  We should begin here by following in the

footsteps of the New York Court of Appeals, the highest court in New York, which

concluded five years ago:

> In light of the near consensus among cognitive and social psychologists that people have significantly greater difficulty in accurately identifying members of a different race than in accurately identifying members of their own race, the risk of wrongful convictions involving cross-racial identifications demands a new approach. We hold that when identification is an issue in a criminal case and the identifying witness and defendant appear to be of different races, upon request, a party is entitled to a charge on cross-racial identification.

*Boone*, 30 N.Y.3d at 526. In response to the *Boone* holding, the Committee on

Criminal Jury Instructions in New York revised the relevant instructions. They

currently read:

> You should consider whether there is a difference in race between the defendant and the witness who identified the defendant, and if so, you should consider that some people have greater difficulty in accurately identifying members of a different race than in accurately identifying

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> members of their own race, and therefore, you should consider whether the difference in race affected the accuracy of the witness's identification.

N.Y. Criminal Jury Instructions 2d (CJI2d): Identification – One Witness (2022), https://www.nycourts.gov/judges/cji/1-General/CJI2d.Identification-One_Witness.pdf; CJI2d: Identification – Witness Plus, https://www.nycourts.gov/judges/cji/1-General/CJI2d.Identification-Witness_Plus.pdf.

In my view, it would be an abuse of discretion for a trial judge to decline such an instruction when relevant and requested. In New York, the instruction must be given in a cross-race identification case unless "'there is no dispute about the identity of the perpetrator'" or "'no party asks for the charge.'" *See* CJI2d: Identification – One Witness n.8 (quoting *Boone*, 30 N.Y.3d at 536). I urge our Washington Pattern Jury Instructions Committee to take on this important work and craft an instruction that reflects what we have learned about the weaknesses of cross-racial identification. Counsel would be well advised to prepare and offer a suitable instruction in the meantime.

I reluctantly concur, however, because Butler did not lay a foundation for the instruction he requested. The requested instruction would allow the jurors to take into account "[t]he witness's familiarity or lack of familiarity with people of the [perceived] race or ethnicity of the perpetrator of the act." 11 WASHINGTON

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Butler*, No. 100276-9 (González, C.J., concurring)

PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.52, at 218 (5th ed. 2021) (second alteration in original).  Butler offered no evidence and elicited no testimony supporting this instruction.  A party is entitled to an instruction only if there is evidence to support it.  *State v. Williams*, 132 Wn.2d 248, 259-60, 937 P.2d 1052 (1997) (citing *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986)). Given the lack of evidentiary foundation, I cannot say the trial judge abused her discretion in declining the instruction.

 With these observations, I concur.

González, C.J.

*State v. Butler*, No. 100276-9
(Yu, J., concurring)

No. 100276-9

YU, J. (concurring) — I concur with the astute observations of Chief Justice González regarding the lack of reliability of cross-racial identifications. I also agree that we should follow New York's lead by adopting an instruction that fully and accurately reflects the proven weaknesses of cross-racial identification. However, I would not merely urge our Washington Pattern Jury Instructions Committee to adopt such an instruction and encourage counsel to offer it. Based on the thorough briefing in this case, our court should take this opportunity to explicitly adopt a model jury instruction on cross-racial eyewitness identifications. *Contra* majority at 2. Going forward, we should require that such an instruction be given in every case where the State relies on cross-racial identification to seek a conviction.

I respectfully concur.

_____
Yu, J.

1